**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GUARANTEED RATE, INC., | No. 1:23-cv-02361 |
| Plaintiff, | Hon. Charles Kocoras |
| v. | Judge Presiding |
| REACT, LLC, | Hon. Young B. Kim |
| Defendant. | Magistrate Judge |
| | JURY TRIAL DEMANDED |
| REACT, LLC, | |
| Counter-Plaintiff, | |
| v. | |
| GUARANTEED RATE, INC., | |
| Counter-Defendant. | |

**<u>ANSWER, AFFIRMATIVE DEFENSE AND COUNTERCLAIM</u>**

Defendant REACT, LLC ("React"), by and through their attorneys, Windy City Trial

Group, Inc., as and for their Answer, Affirmative Defense and Counterclaim to the Complaint filed

by Plaintiff Guaranteed Rate, Inc. ("GR"), states as follows:

**Parties, Jurisdiction and Venue**

1.      Guaranteed Rate is a Delaware corporation in the mortgage banking industry with
its principal place of business in Chicago, Illinois.

**ANSWER:**    Defendant **ADMITS** the allegations set forth in Paragraph (1) of the Complaint.

2.      Defendant is a limited liability company organized under the laws of the State of
Florida with its principal place of business in Largo, Florida. On information and belief,
Defendant's sole member is Frank Maggio, an individual residing in the State of Florida.

**ANSWER:**    Defendant **DENIES** Frank Maggio is the sole member of React, LLC. Answering

further, Defendant **ADMITS** remaining the allegations set forth in Paragraph (2) of the Complaint.

1

3.      The amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

**ANSWER:**      Defendant **ADMITS** the allegations set forth in Paragraph (3) of the Complaint.

4.      This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(a)(1) because this action is between citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest, costs, and attorneys' fees.

**ANSWER:**      Defendant **ADMITS** the allegations set forth in Paragraph (4) of the Complaint.

5.      Defendant, through its officers, employees, representatives, and agents, has been actively and purposefully engaged in transactions and has been engaged in a continuous course of business within the State of Illinois and this district.

**ANSWER:**      Defendant **DENIES** a continuous course of conduct to the extent it infers general personal jurisdiction over Defendant. Answering further, Defendant **ADMITS** the remaining allegations set forth in Paragraph (5) of the Complaint as it relates to specific personal jurisdiction over Defendant in these proceedings.

6.      In 2021, Defendant entered into a contract with Guaranteed Rate and provided certain services to Guaranteed Rate in Chicago, Illinois and to receive certain payments from Guaranteed Rate in Chicago, Illinois.

**ANSWER:**      Defendant **ADMITS** the allegations set forth in Paragraph (6) of the Complaint.

7.      Based on the foregoing, Defendant has committed acts which submit it to personal jurisdiction within Illinois and this district as defined in § 2-209(a)(1) and (7) of the Illinois Code of Civil Procedure. 735 ILCS 5/2-209(a)(1), (7).

**ANSWER:**      Defendant **ADMITS** it is subject to the personal jurisdiction of this Court. Answering further, Defendant **DENIES** the remaining allegations set forth in Paragraph (7) of the Complaint.

8.      Based on the foregoing, the Court has personal jurisdiction over Defendant.

**ANSWER:**      Defendant **ADMITS** it is subject to the specific personal jurisdiction of this Court. Answering further, Defendant **DENIES** the remaining allegations set forth in Paragraph (8) of the Complaint.

9.    Venue is proper in the district because Defendant is subject to the Court's jurisdiction in this district and because the transactions and occurrences out of which this dispute arose occurred in this district.

**ANSWER:**    Defendant **ADMITS** the allegations set forth in Paragraph (9) of the Complaint.

### Facts Common to All Causes of Action

10.    Guaranteed Rate is in the business of originating, closing, and selling mortgage loans and related products.

**ANSWER:**    Upon information and belief, Defendant **ADMITS** the allegations set forth in

Paragraph (10) of the Complaint.

11.    Defendant    markets    itself as    an    experiential    advertising technology and entertainment company.

**ANSWER:**    Defendant **ADMITS** the allegations set forth in Paragraph (11) of the Complaint.

12.    In 2021, Guaranteed Rate and Defendant were in discussions about engaging Defendant to provide certain marketing services on a limited basis through a pilot program.

**ANSWER:**    Defendant **ADMITS** that beginning in July 2021, GR and Defendant were in

discussions about engaging Defendant to provide certain marketing services via a Pilot Campaign.

Answering further, Defendant **DENIES** the remaining allegations set forth in Paragraph (12) of

the Complaint.

13.    On January 3, 2022, Guaranteed Rate entered into an agreement with Defendant, attached hereto as Exhibit A[1], for certain marketing and advertising services ("Insertion Order") .

**ANSWER:**    Defendant **ADMITS** that the subject Insertion Order for certain marketing and

advertising services was received on January 3, 2022. Answering further, Defendant affirmatively

states said Insertion Order represented one of several pre- and post-Insertion Order obligations of

GR pursuant to an agreement made by then GR CMO Steve Moffat and Defendant in September

---

[1] The Insertion Order incorporates by reference Version 3.0 of the Standard Terms and Conditions for Internet Advertising for Media Buys One Year or Less, which is included as part of Exhibit A.

2021. Answering further, Defendant **DENIES** the remaining allegations set forth in Paragraph (13) of the Complaint.

14. As part of the Insertion Order, the parties agreed that Defendant's revenue would be "capped at $25,000." (Ex. A § 6.)

**ANSWER:** Defendant **ADMITS** the allegations set forth in Paragraph (14) of the Complaint to the extent revenue for the specific Insertion Order was capped at $25,000 but **DENIES** any inference from said allegation that the limit to Defendant's revenue pursuant to other terms of the prior agreements between the parties was capped at $25,000.

15. On January 19, 2022, Defendant sent Guaranteed Rate Invoice No. GR-220119 ("Invoice"), attached hereto as Exhibit B, for certain services totaling $20,000.00. (Ex. B.)

**ANSWER:** Defendant **ADMITS** on January 19, 2022 it sent invoice GR-220119 requesting payment of monies due and owing to Defendant from GR. Answering further, Defendant states GR-220119 reflects the $20,000 fixed-fee Pilot Campaign approved by GR CMO Steve Moffat in September 2021. Accordingly, Defendant **DENIES** the remaining allegations set forth in Paragraph (15) of the Complaint.

16. Though Defendant pitched additional performance-based programs and services to Guaranteed Rate when it provided the Invoice, Defendant's Chief Executive Officer ("CEO") confirmed on two separate occasions in writing that Guaranteed Rate's costs for the services provided through January 14, 2022 were $20,000. (*See* Ex. C, Email Thread Between F. Maggio and K. Ahrens, et al. p. 1-2.)

**ANSWER:** Defendant **ADMITS** that Defendant's CEO confirmed on two separate occasions that the aforementioned Pilot Campaign revenue was limited to $20,000 via impression-based services. Answering further, Defendant **DENIES** the remaining allegations set forth in Paragraph (16) of the Complaint.

17. On March 30, 2022 Guaranteed Rate paid the Invoice in full via ACH transfer of $20,000.00 to Defendant.

**ANSWER:** Defendant **ADMITS** the allegations set forth in Paragraph (17) of the Complaint.

18.     Guaranteed Rate never received any additional invoices from Defendant after the January 19, 2022 Invoice.

**ANSWER:**     Defendant **ADMITS** the allegations set forth in Paragraph (18) of the Complaint.

19.     In January 2023, Guaranteed Rate conducted an audit and discovered for the first time that it made two inadvertent ACH transfers to Defendant totaling $381,100.00.:

•     On May 24, 2022, Guaranteed Rate inadvertently made an ACH transfer to Defendant for $190,550.00 that was intended for a different third-party vendor.

•     On October 17, 2022, Guaranteed Rate inadvertently made a second ACH transfer to Defendant for $190,550.00 that was intended for a different third-party vendor.

**ANSWER:**     Defendant **ADMITS** receiving a total of $381,100.00 from two GR payments on

May 24, 2022 and October 17, 2022. Answering further, Defendant currently lacks knowledge

or information sufficient to form a belief as to the truth or falsity of the remaining allegations

set forth in Paragraph (19)  of the Complaint.

20.     Both inadvertent transfers were the result of a clerical error. Defendant's ACH transfer information was mistakenly added to the profile of a different third-party vendor in Guaranteed Rate's accounts payable platform, which caused ACH transfers intended for that third-party vendor to instead be delivered to Defendant.

**ANSWER:**     Defendant currently lacks knowledge or information sufficient to form a belief

as to the truth or falsity of the allegations set forth in Paragraph (20).

21.     Defendant never contacted Guaranteed Rate to inquire about or return either inadvertent ACH transfer.

**ANSWER:**     Defendant **ADMITS** it never reached out to GR about return of the ACH transfer.

Answering further, Defendant currently lacks knowledge or information sufficient to form a belief

as to the truth or falsity of the remaining allegations set forth in Paragraph (21) of the Complaint.

22.     On January 27, 2023, Guaranteed Rate contacted Defendant's representatives requesting a return of the mistaken ACH transfers.

**ANSWER:**     Defendant **ADMITS** GR reached out to Defendant's representatives requesting

return of the ACH transfers. Answering further, Defendant currently lacks knowledge or

information sufficient to form a belief as to the truth or falsity of the remaining allegations set forth

in Paragraph (22) of the Complaint.

23.     In response, Defendant indicated that it was conducting an investigation intoe Guaranteed Rate's request. Then, on February 3, 2023, Defendant's representatives responded to Guaranteed Rate alleging that the two mistaken transfers "were treated as payment" for certain advertising and marketing services.

**ANSWER:**     Defendant currently lacks knowledge or information sufficient to form a belief

as to the truth or falsity of the allegations of "two mistaken transfers." Answering further,

Defendant **ADMITS** the remaining allegations set forth in Paragraph (23) of the Complaint.

24.     In further correspondence with Guaranteed Rate, Defendant's counsel indicated that Defendant would not agree to return the $381,100.00 inadvertently transferred to Defendant.

**ANSWER:**     Defendant **ADMITS** it would not agree to return the payments totaling

$381,000.00 owed to Defendant and paid by GR. Answering further, Defendant currently lacks

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations set forth in Paragraph (24) of the Complaint.

25.     Defendant's counsel indicated that Defendant considered the inadvertent transfers to constitute compensation for advertising and marketing services.

**ANSWER:**     Defendant currently lacks knowledge or information sufficient to form a belief as

to the truth or falsity of the allegations of "inadvertent transfers." Answering further, Defendant

**ADMITS** the remaining allegations set forth in Paragraph (25) of the Complaint.

26.     Defendant did not provide evidence of any separate written agreement signed by both parties amending or superseding the Insertion Order or any additional invoice for additional charges.

**ANSWER:**     Defendant **ADMIT** the allegations set forth in Paragraph (26) of the Complaint.

## COUNT I
## RESTITUTION FOR UNJUST ENRICHMENT

27.     Guaranteed Rate restates and re-alleges Paragraphs (1)—(26) of this Complaint.

**ANSWER:**     Defendant incorporates its Answers to Paragraphs (1)—(26) of the Complaint as

and for its Answers to Paragraph (27) of the Complaint as if fully set forth herein.

28.     Both of the two ACH transfers of $190,550.00 from Guaranteed Rate to Defendant were mistaken and inadvertent.

**ANSWER:**     Defendant currently lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph (28) of the Complaint.

29.     Defendant's receipt of $381,100.00 from Guaranteed Rate resulted from an unintentional clerical error.

**ANSWER:**     Defendant currently lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph (29) of the Complaint.

30.     Defendant received a benefit to which it was not entitled when it accepted the $381,100.00 in inadvertent ACH transfers.

**ANSWER:**     Defendant **DENIES** the allegations set forth in Paragraph (30) of the Complaint.

31.     Despite demands that it do so, Defendant has failed to return the $381,100.00 to Guaranteed Rate, and Guaranteed Rate has not been otherwise compensated for the inadvertently transferred $381,100.00.

**ANSWER:**     Defendant **ADMITS** is has not returned $381,100.00 tendered by GR. Answering further, Defendant currently lacks knowledge or information sufficient to form a belief as to the truth or falsity of an "inadvertent transfer." Answering further, Defendant **DENIES** the remaining allegations set forth in Paragraph (31) of the Complaint.

32.     At the time of the inadvertent transfers, Defendant knew that Guaranteed Rate had paid its only outstanding invoice from Defendant.

**ANSWER:**     Defendant **ADMITS** that it knows GR paid invoice GR-220119 in full and attached as Exhibit A to the Complaint but **DENIES** any inference that said invoice was the only monies owed to Defendant.

33.     At the time of the inadvertent transfers, Defendant knew that the Insertion Order governing the relationship between the parties limited Defendant's total possible revenues from Guaranteed Rate to $25,000.

**ANSWER:** Defendant currently lacks knowledge or information sufficient to form a belief as to the truth or falsity of "inadvertent transfers." Answering further, Defendant specifically **DENIES** the Insertion Order represents the sole monies owed by GR to Defendant. Answering further, Defendant **DENIES** the remaining allegations set forth in Paragraph (33) of the Complaint.

34.     At the time of the inadvertent transfers, Defendant knew that Defendant was not providing services to Guaranteed Rate.

**ANSWER:** Defendant **DENIES** the allegations set forth in Paragraph (34) of the Complaint.

35.     The Insertion Order does not contain any provisions relating to the return of inadvertently transferred funds or mistaken payments.

**ANSWER:** Defendant **ADMITS** the allegations set forth in Paragraph (35) of the Complaint.

36.     Under these circumstances, equity requires that Defendant be compelled to return Guaranteed Rate's money.

**ANSWER:** Defendant **DENIES** the allegations set forth in Paragraph (36) of the Complaint.

**WHEREFORE**, Defendant REACT, LLC prays that this Honorable Court entered an Order dismissing the above-entitled cause *in toto*, with prejudice, and other such relief this Court deems just and proper.

## COUNT II
## CONVERSION

37.     Guaranteed Rate restates and re-alleges Paragraphs 1-26 of this Complaint.

**ANSWER:** Defendant incorporates its Answers to Paragraphs (1)—(26) of the Complaint as and for its answers to Paragraph (37) as if fully set forth herein.

38.     Defendant has unauthorized and wrongful control over money belonging to Guaranteed Rate.

**ANSWER:** Defendant **DENIES** the allegations set forth in Paragraph (38) of the Complaint.

39.     Guaranteed Rate is entitled to the money being wrongfully retained by Defendant.

**ANSWER:** Defendant **DENIES** the allegations set forth in Paragraph (39) of the Complaint.

40.     The inadvertent transfers were of specific and identifiable sums equaling $380,100.00 [sic] delivered to Defendant's bank account.

**ANSWER:**     Defendant **ADMITS** $381,100.00 was delivered by Plaintiff to Defendant's bank account. Answering further, Defendant currently lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in Paragraph (40) of the Complaint.

41.     Guaranteed Rate has an absolute and unconditional right to the $380,100.00 [sic] because the transfers of same were inadvertent and not due or owing to Defendant.

**ANSWER:**     Defendant currently lacks knowledge or information sufficient to form a belief as to the truth or falsity as to whether the alleged payment of $380,100.00 to Defendant by Plaintiff was inadvertent. Answering further, Defendant **DENIES** the remaining allegations set forth in Paragraph (41) of the Complaint.

42.     Guaranteed Rate has made repeated demands upon Defendant to return the $380,100.00 in inadvertent transfers.

**ANSWER:**     Defendant **ADMITS** Plaintiff has made repeated demands of Defendant to return $381,100.00 to Plaintiff. Answering further, Defendant currently lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph (42) of the Complaint.

43.     Defendant has wrongly refused to comply with Guaranteed Rate's demand.

**ANSWER:**     Defendant **DENIES** the allegations set forth in Paragraph (43) of the Complaint.

## AFFIRMATIVE DEFENSE
### Accord and Satisfaction

A.      React and GR entered into a valid contract.

B.      In the alternative, React performed work to the benefit of GR and which equity demands reasonable compensation.

C.      In reliance upon GR's contract with then GR CMO Steve Moffat on September 01, 2021, React made substantial, time-sensitive and nonrefundable money advances exceeding $20,000 for a fixed-fee Pilot Campaign, reflected in invoice GR-220119 (Complaint, Exhibit A) paid in full by GR six months later, on March 30. 2022.

D.      The Pilot Campaign ran through the first 10 weeks of the 2021-2022 season of the National Football League ("NFL").

E.      In further reliance on representations of Moffat and his marketing team, and GR's election to participate in the Balance of the Season Campaign, from October 5, 2022 to January 26, 2022 React made certain time sensitive, non-refundable advertising buys and offered $504,000 worth of in-kind prizes for the GR-sponsored the "Home Free for a Year" promotion and a ValPak direct mail drop of GR-branded advertising to 37 million households in November 2021, and another 37 million household drop in January 2022 as part of the Balance of Season Campaign for the remainder 2022-2021 NFL season.

F.      React's total expenses actually incurred and its contractual commitment to purchase GR-branded prizes and related promotional activities to the benefit of GR exceeded $388,000, despite GR's repeated failure to timely provide performance tracking parameters to React that

would allow React to generate billable revenue from NFL Week 6 through the Balance of the Season Campaign.

G.      On May 24, 2022, GR tendered $190,550 to React via ACH transfer.

H.      On October 17, 2022 GR tendered $190,550 to React via ACH transfer.

I.      While less that the total spent by React to the benefit of GR, React nonetheless accepted the aforementioned payments as satisfaction of the expenditures made by React to the benefit of GR.

WHEREFORE, Defendant REACT, LLC prays that this Honorable Court enter an Order dismissing the above-entitled cause *in toto* and other such relief this Court deems just and proper.

## COUNTERCLAIM

Defendant/Counter-Plaintiff REACT, LLC ("React"), by and through its attorneys Windy City Trial Group, Inc., as and for their Counterclaim against Plaintiff/Counter-Defendant GUARANTEED RATE, INC. ("GR"), states as follows:

### Summary of the Counterclaim

In July 2021, well in advance of the 2021-2022 regular season of the National Football League ("NFL"), then GR Chief Marketing Officer ("CMO") Steve Moffat entered into advertising discussions with React CEO Frank Maggio and React's lead investor Matt Birk. Birk was the starting Center for the 2013 Super Bowl Champion Baltimore Ravens, the 2011 Walter Payton Man-of-the-Year, and current board member of the Gridirons Greats Assistance Fund, the latter formerly chaired by Chicago Bears legend Mike Ditka. The parties agreed that GR would participate in two advertising campaigns as part of React's Super Squares® 2021-2022 NFL season

campaign ("Super Squares®"), a software gaming application ("App") and an associated Twitch[2] live stream. Once timely launched, React's Super Squares would expose GR advertising to tens of thousands of Super Squares® players each week throughout the upcoming 285-game NFL season.

Within the first four weeks of the successful ten-week fixed-fee Pilot Campaign, Moffat also committed GR to a series of time-sensitive obligations necessary to enable React to track and bill revenue to GR pursuant to certain agreed advertising deliverables (hereinafter "performance tracking parameters") for a second Balance of the Season Campaign. However, a series of material breaches by GR of the contract entered into by Moffat, and a series of departmental handoffs and subsequent chaotic departures of key CR members of Moffat's team—including Moffat himself— caused GR to repeatedly fail to deliver its obligations to React, and proximately caused the unrecoverable loss of React's projected impression-based revenue in excess of $1.5 million by missing approximately 200 NFL game-advertising opportunities. GR's alleged "inadvertent" late payments to React simply allowed React to pay off cash and in-kind GR-sponsored prizes and promotional costs that React had contractually committed or advanced in good faith on behalf and to the benefit of GR and to the winners playing React's Super Squares App.

## Parties

1.     GR is a Delaware corporation in the mortgage banking industry with its principal place of business in Chicago, Illinois.

2.     React is a limited liability company organized under the laws of the State of Florida with its principal place of business in Largo, Florida. Defendant's CEO is Frank Maggio, an

---

[2] Twitch is an American video live streaming service that focuses on video game live streaming, including broadcasts of esports competitions, in addition to offering music broadcasts, creative content, and "in real life" streams. Twitch is operated by Twitch Interactive, a subsidiary of Amazon.com, Inc.

individual residing in the State of Florida.

## Jurisdiction

3.      This is a compulsory counterclaim under Fed. R. Civ. P. 13 in that this cause of action arises out of the transactions or occurrences that is the subject matter of the opposing party's claim, *i.e.,* unjust enrichment and conversion.

4.      Personal jurisdiction of GR was established upon GR's filing of the underlying Complaint against React.

## Background Facts

*Super Squares® Active Advertising Model*

5.      React is the exclusive provider of the patented software application Super Squares® NFL Football Game Show ("Super Squares®") which was invented by React's CEO Frank Maggio.

6.      What makes Super Squares® attractive to advertisers is that it turns ads into content people choose to fully view and engage with for an extended period.  It does so by changing the traditional paradigm from one where sports fans passively watch commercials, to players of the Super Squares® App actively paying attention and answering questions about the advertising brand while playing the Super Squares® game in exchange for prizes, where the game show points and the likelihood of winning increases as the number of advertising questions a Super Squares® player is served are skillfully answered correctly.

7.      Touchpoint is a term React uses to measure the desired activity of a consumer's reaction to a commercial. In Super Squares, these touchpoints typically occur when players have:

- Watched the Ad
- Replayed the Ad
- Rated the Ad
- View branded images and logos

- Answered a Question About the Brand
- Are Exposed to Banners and Logos while playing the Super Squares Game

8.      Normally, advertisers would compensate React up to $0.10 per "Reactive eXPerience" or RXP. An RXP typically delivers five touchpoints being completed by a Super Squares® player.

*Pilot Campaign Proposal to GR*

9.      In July 2021, well in advance of the 2021-2022 of the NFL Regular Season, then GR Chief Marketing Officer ("CMO") Steve Moffat ("Moffat") entered into advertising discussions with React CEO Frank Maggio and React's lead investor Matt Birk.

10.      The parties agreed orally and then confirmed via email between Maggio and Moffat on September 01, 2021 that GR would agree to one, and then in late September, two advertising campaigns.

11.      The first campaign was a 10-week "Pilot Campaign" to demonstrate the viability of the Super Squares® RXP concept and the potential revenue that React would earn and bill to GR during the second half of the Pilot Campaign and thereafter via a second Balance of the Season Campaign.

12.      The Pilot Campaign was provided by React to GR for a fixed fee of $20,000, a  loss leader to be recovered by React via revenue generating impressions[3] provided by React to GR.

13.      On March 30, 2022, the Pilot Campaign was finally paid in full by GR.

14.      Initially, for the Balance of the Season Campaign, React further agreed to discount its revenue generation rate from $0.10 to $0.07 per RXP.

---

[3] An impression is a metric used to quantify the number of digital views or engagements of a piece of content, usually an advertisement, digital post, or a web page. Impressions are used in online advertising where the provider is paid on a per-impression basis.

15.     The Pilot Campaign called for GR to receive exposure to tens of thousands of Super Squares® players and listeners of KFAN, a popular Minneapolis-St. Paul sports radio station. Added to the Pilot Campaign—at the suggestion of GR—was a 10-week "Bigger Game" contest sponsored by GR to be entitled "Home Free for a Year." During the Pilot Campaign, one or two Super Squares® players would win their monthly rent or monthly mortgage payments paid for a year.

16.     If successful, the Pilot Campaign would be followed by a Balance of the Season Campaign ending with the Super Bowl:

 **Full 2021-22 Season** – Category Exclusivity 



| Inaugural Sponsor - All Games, Post-Pilot | | | | Full Season: | $ 1,960,000 |
|---|---|---|---|---|---|
| Period | Cost (Cash) | In-Kind | RXP's | Games | Touchpoints |
| Pilot 1 - 10 | $ - | $ 20,000 | 1,000,000 | 42 | 15,000,000 |
| Wks 11 - 18 | $ 784,000 | $ 196,000 | 14,000,000 | 37 | 210,000,000 |
| Playoffs | $ 768,000 | $ 192,000 | 12,000,000 | 13 | 180,000,000 |
| Total | $ 1,552,000 | $ 408,000 | 27,000,000 | 92 | 405,000,000 |



17.     The Balance of the Season Campaign called for GR to pay React a projected $1,552,000 in cash and $388,000 ($196,000+$192,000) for in-kind prizes and promotions paid by React on behalf of GR to marketing companies and to winning Super Squares players.

18.     React's projected $1,552,000 in revenue was to be determined and invoiced to GR by the number of RXP's generated by the Super Squares players during each week of NFL games. This is the only method by which React normally generates revenue from its Super Squares® App.

19.     On September 01, 2021, Maggio informed Moffat that a time-sensitive opportunity existed to join two ValPak[4] mailings to promote the Balance of the Season Campaign using Super Squares®, one in November 2021 and a second in January of 2022 which would reach some 37 million households in each mailing—households being GR's target market for mortgage products.

20.     On September 11, 2021 Moffat approved the Pilot Campaign and delegated GR responsibilities of the Pilot Campaign's execution to GR employees Ryan Ward and Justin Kurt who would work with React's team of Maggio and Terry Taormina.

21.     In late September 2021 Moffat approved the Balance of the Season Campaign.

*Revision of the Balance of the Season Campaign*

22.     Parallel to execution of the Pilot Campaign, several conference calls were held with React, Ryan Ward and Justin Kurt to approve and discuss the modification of the Balance of the Season Campaign, including the NFL Regular Season, Playoffs and the Super Bowl.

23.     In light of the ValPak's ability to deliver GR's target market, GR proposed and React agreed to a modification of the contract wherein React would be compensated by GR based on certain performance tracking parameters timely provided by GR. React would then input these parameters into its Super Squares® App to track the number of clicks, mortgage applications completed, and funded mortgages, as opposed to RXPs. React would be paid $1,000--$1,500[5] per in-process mortgage application. React would be eligible for this alternate form of compensation commencing during the Pilot Campaign and continuing through the Balance of the Season Campaign.

---

[4] Valpak Direct Marketing Systems, LLC, commonly known as Valpak, is a North American direct marketing company owned by Platinum Equity. Formed in 1968, Valpak provides print, mobile and online advertising, customer data and coupons.

[5] The range of payment was tied to the number of in-process applications completed.

24.     Justin Kurt committed to timely deliver the aforementioned performance tracking parameters which was expected no later than NFL Week 6 of the Pilot Campaign.

25.     Critically, and at all times relevant, GR knew or reasonably should have known that React was in the business of advertising and was not a mortgage broker.

26.     React agreed to the change in compensation based on the fact that even a very conservative industry estimate of a 0.01% applicant rate from the 37 million households reached by ValPak would generate $3.7—5.5 million in revenue to React from each ValPak mailing, well in excess of React's projected $1,552,000 from its Super Squares® RXP platform.

27.     Unbeknownst to React, as it was not a mortgage broker, it was illegal for GR, a mortgage lender, to pay React a fee of $1,000--$1,500 per in-process mortgage application if React was not a mortgage broker.

28.     GR knew or reasonably should have known it was illegal for GR to pay React a fee of $1,000--$1,500 per in-process mortgage application if React was not a mortgage broker.

29.     The first week of the NFL season began on September 09, 2021.

30.     By October 15, 2011, with the Pilot Campaign having completed NFL Week 6 of 10, GR had still not provided the performance tracking parameters to React for the Balance of the Season Campaign, nor had a final agreement as to the modified compensation structure been provided to React by GR. React was now losing unrecoverable revenue opportunities during each passing NFL Week that GR failed to perform this material term of the contract.

31.     On October 21, 2021, with the Pilot Campaign having just completed NFL Week 7 of 10, Taormina once again requested performance tracking parameters previously promised by Justin Kurt.

32.     By October 27, 2021, React's lead investor Matt Birk reached out to Moffatt to inform him that while GR's advertising had made it into the Valpak November mailer, no performance tracking parameters could be included because said parameters had not been provided by GR to React.

33.     The failure to timely provide the aforementioned performance tracking parameters was a breach of the contract between React and GR.

*GR Continues to Breach the Contract*

34.     On October 27, 2021, with the ValPak and related promotional expenses in excess of $388,000 already paid or contractually committed by React to the benefit of GR, and with React having already altered its business model from impression-based to performance-based compensation, Justin Kurt sent an email to React, retracting the performance-based compensation arrangement and proposed alternative forms of compensation.

35.     On October 29, 2021, React was introduced to a new GR team member via conference call named Kenny Ahrens, then GR's Head of Affiliate Marketing.

36.     At this point only one-week remains in the Pilot Campaign, and React's first opportunity to generate revenue from the Balance of the Season Campaign is just two weeks away. The ValPak mailer has already lost value as a revenue opportunity for React as the tracking performance tracking parameters, *e.g.,*URL rate.com/super to promote and allow Super Squares players to apply for mortgages has still not been provided by GR.

37.     During the October 29, 2021 call attended by Ahrens, Maggio, Taormina and Rick Thompson, the participants reviewed the GR advertising efforts already undertaken as well as discussion of the next ValPak mailer.

38.     Instead of proceeding with urgency to provide React with GR's performance tracking parameters, Ahrens instead demanded a complete re-review of the marketing materials. Ahrens also demanded that React complete, for the first time since the Pilot Campaign began in early September, several "onboarding requirements" including a Nondisclosure Agreement, further delaying unrecoverable revenue opportunities for React as the NFL season marched on.

39.     While GR continued to enjoy the advertising benefits of the Pilot Campaign and the first ValPak mailer, using monies React timely advanced that were supposed to come from GR. There was still no way for React to generate revenue caused by GR's ongoing failure to provide its performance tracking parameters to React.

40.     By December 03, 2021, as the Regular Season entered NFL Week 14 of 18, GR finally "approved" the Balance of Season Campaign. However, GR continued to breach its obligation to provide performance tracking parameters so that React could begin earning revenue though its Super Squares® App. Instead, React has now spent in excess of $20,000 for expenses of the Pilot Campaign and contractually committed to or expended in excess of $388,000 toward the Balance of Season Campaign for the benefit of GR.

41.     In sum, as of December 03, 2021, React and contractually committed or paid for GR-branded advertising and prize promotions, and still no revenue opportunity for React to recover these expenses, let alone make a profit. All this while GR continued to enjoy the benefit of the Pilot Campaign; and ValPak mailers to some 37 million households, and goodwill derived from GR-branded Home Free livestream giveaways on Twitch, hosted by former ESPN sports radio host Mike Golic: q.cr/homefree1.

42.     With unrecoverable performance-based revenue opportunities continuing to accumulate through each passing NFL Week, on December 15, 2011, React quickly reviewed and

redlined an Insertion Order presented by GR, emphasizing this was to be the first of several anticipated Insertion Orders for the Balance of Season Campaign and beyond.

43.     While the aforementioned Insertion Order was finally approved after Christmas, it was now NFL Week 14 of 18 of the Regular Season. React was still unable to generate <u>any</u> revenue because GR had <u>still</u> not provided the performance tracking parameters needed for React to track and bill GR for performance-based revenues.

44.     In an effort to salvage the season, Maggio then suggested reviving a previously discussed co-promotion with React to compete with GR competitor Rocket Mortgage's planned Super Bowl Squares game, which ran nationally throughout the NFL Playoffs and the Super Bowl.

45.     On January 09, 2022, the NFL Playoffs began.

46.     Incredibly, by January 26, 2022, with only two playoff games and the Super Bowl remaining, GR had <u>still</u> not provided the requisite performance tracking parameters from which React could even *__begin__* earning performance-based fees.

47.     Shortly thereafter, and over the subsequent months, internal chaos at GR came to light as Moffat and the entire GR team assigned to the Pilot and Balance of Season Campaigns were inexplicably no longer with the company.

48.     By March 31, 2022, React had contractually committed or spent in excess of $388,000 in GR-branded prizes and related promotional costs, and had sacrificed even being able to earn the original $1,552,000 in projected RXP touchpoints, due to a total and utter failure of GR to live up to their end of the bargain.

49.     On March 30, 2022, GR finally paid the $20,000 fixed-fee for the Pilot Campaign.

50.    On May 24, 2022, GR made a payment to React of $190,550. This amount was only $5,450 short of the $196,000 In-Kind prizes and promotional costs planned for Weeks 11-18 of the Balance of the Season Campaign.

51.    On October 17, 2022, GR paid React another $190,550. This was just $1,450 short of the $192,000 of In-Kind prizes and promotional costs planned for the NFL Playoffs, with GR still owing $6,900 of the aggregate $388,000 in out-of-pocket expenses and prizes committed or paid by React to the benefit or GR, with zero corresponding performance revenue that could be earned by React due to the utter and complete failure of GR to keep its end of the bargain.

52.    On October 11, 2022, GR sent a payment of $4,085.90 which React applied to the $6,900 balance due.

53.    On December 20, 2022, GR sent a payment of $4,485.87 which React applied to the balance due. GR had now paid $389,631 towards the $388,000 amount React had presented to GR over one year earlier yet React has still not been made whole.

54.    GR instead sued React in the above-entitled cause, claiming it "inadvertently" paid $381,100 it owed to another vendor.

55.    React has been damaged from zero performance-based revenue generated due to contract breaches or inequitable conduct by GR. But for GR offering to pay React an illegal fee for in-process mortgage applications, React had a reasonable expectation of generating as much as $11 million in fees from leads generated by its Super Squares App from NFL Week (6) through the remainder of the 2021-2022 NFL season.

56.    As React will be unable to recover fees that GR was prohibited to pay by law, React's damages must revert to its non-speculative projection of $1,552,000 in RXP touchpoint revenue as set forth Paragraph (16) of this Counterclaim.

## CLAIM ONE
### Breach of Contract

57.    React incorporates Paragraphs (1)-(56) as and for Paragraph (57) as if fully set forth here.

58.    React and GR entered into valid contracts in September 2021.

59.    React performed all of its material obligations pursuant to the aforementioned contracts.

60.    GR breached the contract by failing to perform the material terms of the contract to which GR was obligated, including but not limited to, the failure to timely provide performance tracking parameters for React to track revenue generated through its Super Squares® App.

61.    React was damaged in the form of lost revenues of $1,552,000.

**WHEREFORE**, Defendant REACT, LLC prays this Honorable Court award Defendants compensatory damages in an amount to be determined at trial but not less than $1,552,000, statutory prejudgment interest and other such relief this Court deems just and proper.

## CLAIM TWO
### Unjust Enrichment
### (Pled in the Alternative)

62.    React incorporate Paragraphs (1)-(56) as and for Paragraph (62) as if fully set forth herein.

63.    React provided a benefit to GR in the form of unreimbursed GR-branded advertising, prizes and related promotional expenses in excess of $388,000 for an advertising promotion identified by the parties as a Balance of Season Campaign, utilizing React's Super Squares® App.

64.    GR alleges it "inadvertently" paid React $381,100 in May and October of 2022 due to a clerical error.

65.     To force React to refund $381,100 to GR and allow GR to benefit from a full season of NFL advertising provided by React to its detriment would violate the fundamental principles of justice, equity and good conscience.

66.     To force React to refund the two additional payments $8.571.77 would allow GR to benefit from a full season of NFL advertising provided by React to its detriment and would violate the fundamental principles of justice, equity and good conscience.

**WHEREFORE**, Defendant REACT, LLC prays this Honorable Court enter an Order awarding it retention of $381,100 previously paid to React, the $8,571.77 in additional payments received by React, and other such relief this Court deems just and proper.

### Jury Demand

Defendant demands a jury trial on all issues so triable.

Dated:  May 22, 2023                                    Respectfully submitted,

                                                        **REACT, LLC.**

                                            By:  */s/ Dennis F. Esford*
                                                 One of Their Attorneys

**WINDY CITY TRIAL GROUP, INC.**
Dennis F. Esford
161 N. Clark Street, Suite 1700
Chicago, Illinois 60601
P: 312-4057725
E: denny@windycitytrialgroup.com
Attorney No. 6281760

23